UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

—————————————————————
)
HOUGHTON MIFFLIN HARCOURT            )
PUBLISHING COMPANY,                  )
                                     )
            Plaintiff,               )
                                     )        C.A. No.
v.                                   )
                                     )
DONALD BACK and IXL LEARNING, INC.,  )
                                     )
            Defendants.              )
—————————————————————)

## VERIFIED COMPLAINT

Houghton Mifflin Harcourt Publishing Company ("HMH") brings this suit against Donald Back and IXL Learning, Inc. ("IXL"), and for its causes of action, states as follows:

## INTRODUCTION

1.      Over the span of just two months, IXL, a competitor of HMH in the Pre K-12 school curriculum, diagnostics, and analytics industry, systematically raided and hired four former HMH senior sales leaders, one of whom accessed confidential HMH information and trade secrets ("Confidential Information") immediately before he resigned, and failed to return it.

2.      IXL first hired Donald Back ("Back"), HMH's former Senior Vice President of Sales, who, notwithstanding his contractual obligations prohibiting him from soliciting HMH employees, later acted as the "pied piper" in hiring away three HMH regional sales managers — Ryan Perryman, Wayne Siegert, and Darrell Miller (the "Regional Sales Managers") — who were collectively responsible for approximately $130,000,000 in annual sales and who, not coincidentally, each resigned within days of each other.

3.     To make matters worse, after tendering his resignation, Back emailed HMH Confidential Information regarding HMH sales strategies and product offerings to his personal email account and downloaded HMH Confidential Information from his HMH Box account, without any legitimate business reason to do so.

4.     Upon information and belief, IXL participated in, encouraged, or directed some or all of Back's unlawful actions.

5.     HMH brings claims against Back for violation of the Defend Trade Secrets Act of 2016 ("DTSA"), violation of the Massachusetts Trade Secrets Act ("MTSA"), breach of contract, and breach of fiduciary duty.   HMH brings claims against IXL for intentional interference with contractual relations.  HMH seeks injunctive relief and damages against Back and IXL.

## PARTIES

6.     HMH is a Massachusetts corporation with a principle place of business in Boston.

7.     Upon information and belief, Back is a citizen of the State of Ohio and resides in Mason, Ohio.

8.     IXL is a Delaware corporation with its principal place of business in San Mateo, California.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because HMH's claim against Back under the DTSA, raises a federal question.  HMH's remaining claims likewise fall within this Court's supplemental jurisdiction (28 U.S.C. § 1367) because they are so related to the federal claim that they form part of the same case or controversy.

10.     This Court has personal jurisdiction over Back because he consented and submitted to jurisdiction of this Court over any suit, action, or other proceeding arising out of, under, or in connection with his equity agreements with HMH.   This Court has personal jurisdiction over IXL because it has committed tortious acts in Massachusetts by interfering with contracts made and performed in Massachusetts.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this dispute occurred within this District.

## FACTUAL ALLEGATIONS

### A.     HMH's Business and Confidential Information

12.     HMH is a global leader in Pre K-12 educational content and services, including core curriculum, supplemental and intervention solutions, and professional learning services.

13.     HMH has a long history of providing core curriculum materials (i.e., digital and print resources for students performing at grade level) used in K-12 classrooms across the country.   Core curriculum represents a comprehensive offering that satisfies the learning standards generally applicable to each grade level or course offering.   HMH's core solutions division develops, acquires, and markets a full range of products for different subjects and grade levels, including but not limited to *Into Math*, *Math in Focus*, *Math Expressions*, *Into Reading*, and *Science Dimensions*.

14.     HMH has also developed and acquired products beyond its core curriculum, known in the industry as "supplemental" offerings.   Supplemental offerings are solutions that address specific needs that a given student may have, such as math or literacy skills.

15.     While a school district typically purchases HMH's core curriculum for the student body across each grade level, supplemental offerings can be purchased for all students or geared

towards the needs of individual students to help assess and improve any issues the student may have.

16.     HMH's supplemental and intervention solutions division develops, acquires, and markets a full range of products for different subjects and grade levels, including but not limited to *Waggle*, *Amira Learning*, *iRead*, *Writable*, and *HMH Classroom Libraries*.

17.     HMH also develops, acquires, and markets intervention programs to assist students struggling in math or literacy.  These products include *Math 180*, *Read 180*, *System 44,* and *English 3D*.

18.     Additionally, HMH develops, acquires, and sells certain diagnostic programs to assess students' abilities and growth in math and reading.  *Amira* contains such an assessment function, as do HMH's *Reading Growth Measure, Math Growth Measure*, *Reading Inventory*, and *Math Inventory* programs.

19.     The core curriculum and supplemental educational technology industry is a highly competitive, specialized business and is becoming even more so with each passing year.

20.     As set forth below, IXL competes directly with the bulk of HMH's supplemental and intervention offerings, especially with regard to HMH's most strategic products.

**B.     HMH Protection of Confidential Information**

21.     HMH invests considerable money each year in product development (over $100,000,000 in 2019) to become a global leader in the core curriculum and supplemental educational services industry.  HMH has maintained as confidential certain highly valuable proprietary business information regarding, among other things, its inventions, products, designs, methods, sales strategies and techniques, customer lists and accounts, business relationships, pricing and costing methods, projects, and non-public financial information.

22.     HMH also goes to great lengths to ensure that its investments in its Confidential Information remain secure.  It invests considerable money each year in tools, technology, and licenses devoted to maintaining the security of its information.

23.     HMH stores HMH Confidential Information in databases hosted on servers maintained in secure data centers.  HMH strictly controls employee access to HMH Confidential Information.

24.     Each HMH employee is provided a username and password that is required to access the employee's HMH email account.  If access is attempted from a web browser or from a non-HMH issued device, in addition to entering their login credentials, the employee must also authenticate their account using a multifactor authentication tool.

25.     Beyond basic access to email, HMH employees seeking access to other applications must be approved through a multi-level approval process from HMH management. Employees are granted access to information on a "need to know basis" only.

26.     Each time an employee requires access to a new or different application, he or she must request access through the multi-level approval process.

27.      In addition to systems hosted through the HMH environment, HMH also utilizes third-party service providers to host other data on their secure networks.

28.     HMH uses Salesforce, a well-known third-party service provider, to host HMH's customer information.  Employee access to information on Salesforce requires the same multi-level approval process used when accessing information on HMH's systems.

29.     Access to customer information on Salesforce is limited to each sales employee's territory and only upper management is granted access to all confidential customer information on Salesforce.

30.     Until January 1, 2020, as the head of field sales throughout the United States, Back had access to all HMH customer data throughout the country.

31.     After HMH restructured its sales team at the beginning of 2020, Back was assigned to lead U.S. sales in adoption states, which account for some of the states with the highest volume of HMH sales.  Notwithstanding his new position, Back retained access to customer information throughout the country in order assist with the transition of the new structure of the sales team.

32.     The Regional Sales Managers also had access to information for all customers within their respective sales territories, which collectively made up approximately 30% of HMH's U.S. territories.

33.     The proprietary business information contained on HMH's systems and through Salesforce is not available or readily ascertainable to the public (or even, as noted above, much of HMH's workforce) and is considered a closely-guarded trade secret by HMH.

34.     In part through the use of HMH Confidential Information and years of business effort, HMH has been able to develop the trade and the patronage of its customers.  The goodwill developed with its clients depends, in large part, on HMH Confidential Information.  This information is integral to HMH's efforts at developing and maintaining its goodwill and, consequently, constitutes a trade secret of HMH.

35.     Because HMH Confidential Information is so important to its business, in addition to restricting access to the information as described above, HMH also makes extensive efforts to protect this asset.  For instance, HMH requires employees with access to such information to execute an employment agreement containing provisions protecting its confidential information.

36.     Additionally, HMH has implemented various policies and procedures to ensure the confidentiality of HMH Confidential Information.  Employees are required to abide by **HMH's Code of Conduct**, which provides that HMH employees may not use for his or her benefit or divulge to a competitor any confidential information relating to HMH or its operations. Under the **Code of Conduct**, the obligation to preserve confidential information continues even after employees leave HMH.

37.     HMH employees are required to complete a training related to the Code of Conduct to ensure that they understand its provisions, including those related to HMH Confidential Information.

38.     The **Code of Conduct** also references **HMH's Acceptable Use Policy**, which is one component of **HMH's Information Security Policy**.  The **Acceptable Use Policy** warns that the misuse of HMH productivity tools can result in the loss/theft of confidential or proprietary information that could negatively impact HMH's competitive advantage.

39.     Section 6.3 of the **Acceptable Use Policy** provides that productivity tools "must not be used to copy, distribute, or forward . . . customer data, trade secrets . . .  or other similarly classified materials except as explicitly permitted by the owner of such materials or after consulting HMH's Legal Counsel."

40.     Section 6.10 further provides that "[p]ersonal email accounts should not be used to conduct Company business."   Section 6.16 also mandates that employees "must not automatically forward their email to an outside email service."

41.     Section 6.10 of **HMH's Information Security Policy** also requires that "HMH company information should only be stored or processed on company equipment."  Where non-company equipment is used to process HMH information, the "information should be transferred

to company systems, checked for viruses and removed from non-company computers as soon as possible."

42.     HMH's Employee Guide, available to all employees on HMH's intranet, also references the Information Security Policy and the Acceptable Use policy and notes that "personal email accounts should not be used to conduct Company business."

43.     Taken together, HMH's policies and procedures are designed to ensure that HMH Confidential Information remains secure and inaccessible to unauthorized individuals and entities.

**C.     HMH Customer Goodwill**

44.     In addition, HMH has invested heavily in developing its goodwill with its customers based on its investment of time and expense in training, supporting and entrusting its employees with its valued customer relationships, and has spent considerable amounts of money over the years to enable its employees to engage and develop clients so as to foster those relationships, determine customer preferences, and produce better products and services based on the customers' unique needs.

45.     Back and the Regional Sales Managers, through their employment with HMH, gained unique knowledge of HMH's customers, products (and products under development), and business strategies which may be used to gain a competitive advantage against HMH.

46.     Throughout the last several years of his tenure at HMH, much of which was spent leading the entire U.S. field sales force and working closely with the senior and executive leadership of the company, Back, in particular, had a deep knowledge of HMH's product strategy, including products in the development pipeline; future planning of the company;

HMH's performance across the country, insights about HMH's technology strengths and weaknesses; pricing strategies; and promotional strategies.

**D.     IXL Is A Competitor Of HMH**

47.     IXL, like HMH, provides K-12 online learning, diagnostic, and analytics products.

48.     IXL's offerings are provided to K-12 schools to meet both core curriculum requirements and to address supplemental and intervention needs.

49.     For example, per its website, IXL offers a "comprehensive K-12 curriculum" and touts itself as "the world's most popular subscription-based learning site for K-12" and that IXL features "a comprehensive curriculum, the IXL Real-Time Diagnostic, and actionable analytics."

50.     IXL's offerings are competitive with HMH, particularly its core curriculum solutions for English Language Arts, Mathematics, Science and Social Studies as well as HMH's supplemental offerings like *Waggle*, *Amira*, and *Writable*.

51.     In fact, HMH considers IXL to be one if its top competitors across nearly all of its supplemental offerings, including HMH's intervention and assessment programs.

52.     Nearly every IXL product competes directly with an HMH product.  For example, *IXL Math* competes with HMH's *Into Math* and *Math 180* products; *IXL Reading* competes with HMH's *Read 180*, *System 44*, and *Into Reading* products; *IXL Science* competes with HMH's *Science Dimensions*; and *IXL Diagnostics* competes with HMH's *Reading Inventory*, *Math Inventory*, *Math and Reading Growth Measure* and *Amira*.

53.     IXL competes with HMH for business in so-called "adoption states" that periodically procure core curriculum materials (i.e., digital and/or print resources) for school districts across their entire state.

54.     For example, in 2018 in connection with Mississippi's core curriculum adoption, both IXL and HMH made presentations for their respective products in the following subjects: Math K-5, Math 6-8, Math-Algebra 1, Math Geometry, and Math Upper Level (Algebra II). IXL's and HMH's respective presentations to the Mississippi Department of Education can be viewed online.  *See* https://www.mdek12.org/OAE/OEER/TextbookAdoptionProcurement/2018-Publisher-Presentations.

55.     Moreover, IXL markets its products as being in alignment with many of HMH's core curriculum offerings.  *See* https://www.ixl.com/resources/curriculum-alignments.

56.     IXL targets the same customer base as HMH in order to sell its core curriculum and supplemental offerings.  Upon information and belief, IXL is marketing to the same school districts that HMH services.

57.     School districts often purchase only one core curriculum offering per grade and subject area, so it is unlikely that a school district would buy from both HMH and IXL to fulfill their needs.

58.     In fact, upon announcing his resignation from HMH, Back exchanged text messages with an HMH employee where he wrote that he was "excited about the battlefield," intimating that he would be competing with HMH on behalf of IXL.

59.     Upon information and belief, at the time Back joined IXL, it had very limited sales capacity and Back was hired to create a team to grow sales of IXL's core curriculum and supplemental products.  Indeed, in an April 7, 2020 press release, IXL announced that Back would "be in charge of accelerating sales worldwide and expanding a strong team that will continue to meet the needs of the K-12 market."

**E.      Back's Agreement With HMH**

60.      HMH hired Back in or about June 2007.  During his employment with HMH, Back was promoted to Senior Vice President of National Sales, with responsibility for the entire U.S. field sales team, including both adoption states and open-territory (i.e., non-adoption) states.

61.      In 2020, HMH restructured its sales staff and Back was assigned to focus more narrowly on field sales for HMH in adoption states.  Back's access to HMH Confidential Information did not change and his compensation remained the same.

62.      As a high ranking HMH employee, Back was offered certain equity awards as part of his compensation.  With the exception of 2014, Back was granted shares in HMH each year between 2013 and 2020.

63.      Only a select group of senior HMH employees and executives are awarded equity as part of their compensation.

64.      On March 5, 2019, HMH offered Back 12,387 restricted units of HMH stock.  On March 5, 2019, HMH's stock price on the NASDAQ closed at $7.75 per share, valuing the equity award at approximately $96,000.

65.      Back's March 5, 2019 equity award was governed by the HMH 2015 Omnibus Incentive Plan Time-Based Restricted Stock Unit Award Notice (the "RSU Agreement").

66.      Section 16 of the RSU Agreement provides that "[n]otwithstanding any other provision herein contained, this Award Notice and the Award contemplated hereunder is contingent upon the Grantee's acceptance of the restrictive covenants attached hereto as Exhibit A."  A copy of the RSU Agreement is attached hereto as Exhibit 1.

67.     Attached to the RSU Agreement as Exhibit A is HMH's Confidentiality, Intellectual Property and Non-Solicitation Agreement (the "Agreement').   A copy of the Agreement is attached hereto as <u>Exhibit 2</u>.  Back accepted the Agreement on March 26, 2019.

68.     The Agreement includes several covenants regarding Back's duties of loyalty to HMH.  Specifically, Section 1 of the Agreement, provides, in part:

> I will not . . . at any time during or after my employment with the Company . . . utilize any Confidential Information . . . for my own benefit or directly or indirectly disclose, or take any action that may result in the disclosure of, any Confidential Information to any third party or to any employee of the Company not also having access to such information, except as necessary for the Company's business and approved by senior management.

Section 1(a) of the Agreement defines confidential information as, "all trade secrets and confidential and proprietary information of the Company" including financial information, marketing information, personnel information, customer information, product information, and other information that HMH maintains as confidential and uses to conduct its business or gain competitive advantage."

69.     Section 2 of the Agreement requires Back, upon HMH's demand or at the termination of his employment, to "immediately return to [HMH] all Company Property in [his] possession, custody or control."   Company Property means "all property and resources of the Company, including without limitation, Confidential Information, memoranda, notes, lists, records and other documents or papers . . . ."

70.     Section 4 of the Agreement further provides that during his employment with HMH and for a one year period thereafter, Back shall not:

> directly, or indirectly, employ, solicit for employment or otherwise contract for the services of any employee of the Company or any of its affiliates at the time of this Agreement or who shall subsequently become an employee of the Company or any such affiliate.

71.     Section 4(c) of the Agreement provides that if Back violates Section 4, he "shall continue to be held by the restriction set forth in this Section until a period equal to the period of restriction has expired without any violation."

72.     In Section 6 of the Agreement, Back acknowledged that

> any breach by me of any of the foregoing provisions of this Agreement will cause the Company to suffer irreparable harm for which damages are an inadequate remedy and are difficult to calculate.  Accordingly, I agree that the Company will be entitled, without limiting any other available legal or equitable remedies, to specific performance and injunctive relief (with the need to post any bond or other security) to enforce the terms of the foregoing provisions and to prevent any breach or threatened breach of any of the same.

**F.      Back's Departure from HMH**

**a.      Back Sends HMH Confidential Information to his Personal Email After Resigning from HMH**

73.     Back tendered his resignation to HMH on March 23, 2020 and his last official day of employment was April 4, 2020.

74.     At 5:35 PM on March 23, 2020 (the day he announced his resignation), Back forwarded an email from his HMH email account to his personal email account, dback6@gmail.com.  The email contained the subject line "Week of 03/20/20 Meeting Minutes from Core Solutions Weekly Sales GM Call" and had been sent to Back earlier that day.

75.     The email contained regional updates from various HMH sales team members — including Ryan Perryman, who later joined Back at IXL — related to HMH's core curriculum business, responding to questions such as "What were your team's major accomplishments (brightspots) last week?", "What are the most important focus areas for your team next week?", and "Are there any impediments in your way?"

76.     The email contained confidential details on sales wins, the status of specific sales pipeline opportunities in progress, and specific insights into product delivery status.

77.     The PowerPoint file attached to the email included confidential information about the schedule for upcoming product releases, sales and marketing information, and several pages devoted to *Waggle*, including information about the sales enablement and lead generation strategy for *Waggle*.

78.     There was no legitimate business purpose for Back to send the email, with attachment, to his personal email account, especially subsequent to his resignation.  Moreover, at the time, HMH employees, including Back were working remotely with access to HMH systems, so he was able to access any HMH information from his remote office.

79.     Over the course of the next couple of weeks, Back continued to email himself HMH Confidential Information.  For example, on April 1, 2020, Back sent himself two emails attaching "pipelines" for two products that HMH distributes on behalf of other companies: *Amira* and *Writable*.

80.     IXL competes directly with *Amira* and *Writable*.

81.     The pipelines consist of spreadsheets that detail sales opportunities being pursued by the sales team (i.e. prospective or potential sales) for each respective product and, importantly, show the status of the opportunity, the value of the opportunity and the probability HMH has determined that the customer will ultimately purchase the product.

82.     The pipelines are considered highly confidential and a competitor would gain an unfair advantage by knowing the identities and status of every sales opportunity of *Amira* and/or *Writable*.

83.     The pipelines are shared with HMH's partners and senior employees during regularly scheduled calls to provide the status of HMH's sales and anticipated sales.   Back participated in those calls until after his resignation, so there was no reason for Back to be sending himself the pipelines.

84.     The *Writable* pipeline document contains over 700 customer names and account information.   The *Amira* pipeline document likewise contains over 500 customer names and account information.

85.     Additionally, on March 27, 2020, Back forwarded an email from his HMH email account to his personal email account, attaching an *Amira* Pilot Dashboard, which contains a summary and details of all HMH customers piloting HMH's *Amira* product, which is competitive with IXL products.

86.     Then, on March 30, 2020, Back again forwarded an email from his HMH email account to his personal email account, attaching a PowerPoint file named "Into Reading PLOT - March 2020.pptx."

87.     The PowerPoint file is a presentation to HMH's sales leadership team outlining product and campaign strategy for HMH's most important reading program, *Into Reading*, including specific details regarding HMH's plans for an upcoming Florida reading adoption campaign that HMH is competing for.

88.     All of the materials sent by Back to his personal email account contain HMH Confidential Information and Back had no legitimate business reason to send them to himself after he had tendered his resignation to HMH.

89.     In addition to emailing himself highly confidential HMH information, Back also engaged in suspicious activity after his resignation using Box, a cloud-based file sharing service used by HMH.

90.     Between January 1, 2020 and March 3, 2020, Back only logged into Box a total of thirteen times.  However, between March 24th and March 31st — the week after his resignation — Back's activity increased substantially.

91.     Indeed, during that week, Back downloaded from Box several files containing HMH confidential information, including a 99-page PowerPoint file describing HMH's partnership with Renaissance, which among other things, describes the *Growth Measure* solution and strategy, and a 232-page PowerPoint file detailing the entire U.S. sales pipeline and status, region by region as of March 4, 2020.

**b.     Back Solicits Other HMH Employees**

92.     In addition to sending himself HMH Confidential Information after his resignation, Back also sent several email messages to other HMH employees to encourage them to leave HMH and join him at IXL.

93.     On March 30, 2020 (the same day he emailed himself the PowerPoint file), Back sent an email from his personal email account to Ryan Perryman, attaching a biography and Back's resume.  Back also asked Perryman to send him his personal email address.

94.     Back sent a similar email to HMH's VP Regional Sales Jason Testa on May 30, 2020, and asked Testa to send him his personal email address as well.

95.     Based on the nature of the emails, with almost no text and Back's request for personal email addresses, it is reasonable to infer that Back was attempting to conceal his communications while sending communications to HMH email accounts and that more fulsome

communications occurred once Back and the HMH employees had connected using their personal emails.

96.     On information and belief, Back requested Perryman and Testa's personal email addresses to be able to communicate with them about joining him at IXL without using his and their HMH email accounts.

### c.      Back Attempts to Access HMH Information After Leaving the Company

97.     On April 7, 2020, IXL sent out a press release announcing it had hired Back as its Vice President of Sales.  The press release states that Back "will be in charge of accelerating sales worldwide and expanding a strong team that will continue to meet the needs of the K-12 market."

98.     Two days after the press release, Back twice attempted to log in to his HMH Salesforce account.  He was unsuccessful because his access had been terminated.

99.     Then, on April 27, 2020 — over three weeks after his last day at HMH — Back again attempted to log in to his HMH Salesforce account.  He was again unsuccessful because his access had been terminated.

### G.      HMH Senior Sales Team Members Follow Back to IXL

100.     On Friday, May 29, 2020, within two months of Back's resignation, Perryman and Miller tendered their resignations from HMH on the same day and announced they were moving to IXL.  On the following Monday, June 1, 2020, Siegert followed suit by resigning and notifying HMH of his intention to work for IXL.

101.     Because of his position at HMH, Back was intimately familiar with the Regional Sales Managers' compensation.

102.    Perryman, HMH's former Central Regional Sales Manager, responsible for Michigan and Ohio, tendered his resignation effective June 12, 2020 and stated that his first day at IXL would be June 22, 2020.  Perryman will be the sales director for IXL in Indiana, Ohio, and Michigan.  Perryman will be working as part of Back's sales team at IXL.

103.    Wayne Siegert, HMH's former Midwest Regional Sales Manager, responsible for North Dakota, South Dakota, Nebraska, Minnesota, Iowa, Wisconsin, and Illinois, tendered his resignation effective June 12, 2020 and stated his first day at IXL would be June 15, 2020. Siegert will be an area sales director for IXL, covering Illinois, Wisconsin, Minnesota, North Dakota, and South Dakota.  Siegert will be reporting directly to Back at IXL and he informed HMH that he would be responsible for building out a sales team at IXL and he would have to fill five positions.

104.    Darrell Miller, HMH's former South Regional Sales Manager, responsible for Kansas, Missouri, Arkansas, Louisiana, and Mississippi, tendered his resignation effective June 12, 2020 and stated his first day at IXL would also be June 15, 2020.  Miller will be IXL's regional sales manager covering Missouri, Kansas, Iowa, and Nebraska and will be servicing the same customer accounts for IXL that he did for HMH.  Miller will be working as part of Back's sales team at IXL.

105.    As depicted on the map below, the Regional Sales Managers accounted for 30% of HMH's U.S. sales territory and were responsible for approximately $130,000,000 in annual sales:



106.    Each of the Regional Sales Managers told HMH that they were not solicited by Back to join IXL.

107.    Perryman admitted during his exit interview that IXL was aware of his non-solicitation and confidentiality restrictive covenant agreement with HMH.

108.    In the past several years, HMH is not aware of any other employee that has left HMH for IXL and it is implausible that the Regional Sales Managers would all coincidentally resign from HMH in quick succession to follow their former boss at his new company.

109.    On information and belief, Back directly (or at least indirectly) encouraged the Regional Sales Managers to resign from HMH and join him at IXL.  Moreover, given his role as the head of IXL's sales team, it is implausible to believe that any of the three could be hired without Back's acknowledgement and approval.

**H.      Back and IXL Deny any Solicitation or Misappropriation**

110.    After learning of the Regional Sales Managers' resignations, HMH sent letters to Back and IXL on June 1, 2020, notifying them of HMH's discovery of Back's misappropriation; demanding that IXL rescind its offers of employment to Perryman, Siegert, and Miller; and demanding that Back and IXL cease their solicitation of HMH employees and other breaches of the Agreement.

111.    On June 3, 2020, counsel for Back and IXL responded to HMH's letters, denying that Back had any involvement with the Regional Sales Managers' decision to join IXL and claiming that no HMH confidential business information or trade secrets were utilized or disclosed.   Notably, Back and IXL did not deny that Back had sent confidential HMH information to his personal email address.   Nor did they deny that Back had directly or indirectly hired the Regional Sales Managers.

<u>**COUNT I**</u>
**Violation of the Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1832, *et seq*. - Against Back**

112.    HMH repeats and realleges Paragraphs 1 –111 above, and incorporates them as if fully set forth herein.

113.    During the course of his employment with HMH, Back was provided access to substantial amounts of HMH confidential information.

114.    HMH's confidential information is not available to the general public and is closely guarded by HMH.   HMH keeps such information strictly confidential in order to maintain a competitive advantage over its competitors.

115.    HMH's confidential information, including the information identified herein, is considered a "trade secret" under the DTSA because the information is not generally known outside of HMH's business, HMH has taken reasonable measures to guard the secrecy of the

information, the information is of great value to HMH and its competitors, HMH invested significant amounts of time and money in developing the information, the information cannot easily be acquired or duplicated by others, and because HMH continuously uses the information in its business.

116.    The economic value of the HMH trade secrets and confidential information Back had access to under the Agreement likely exceeds $100,000,000, when considering HMH's product development and the annual sales Back oversaw.

117.    Back misappropriated HMH's trade secrets by improperly sending the same to his personal email account for no valid business reason and despite knowing that he was not authorized to retain the same, shortly after he resigned from HMH to join IXL, a direct competitor.

118.    Following his resignation, Back failed to return HMH Confidential Information to HMH.

119.    Alternatively, Back has threatened to misappropriate HMH's trade secrets by covertly sending the trade secrets to his personal email account with the intent to use the trade secrets to compete on behalf of IXL.

120.    HMH requests an order enjoining Back and/or IXL from using any HMH confidential information, and from disclosing HMH confidential information to anyone not authorized to receive the confidential information.

121.    HMH also requests an order requiring Back to return any and all HMH confidential information to HMH and to account for what he has done with it since it has been in his possession.

122.     Back's misappropriation of HMH confidential information has been willful and malicious, and HMH has incurred significant damages as a result of the misappropriation.

123.     Back's actions have damaged HMH's legitimate business interests.

124.     HMH is therefore entitled to compensatory and exemplary damages in an amount to be proven at trial, as well as reasonable attorneys' fees.

**<u>COUNT II</u>**
**<u>Violation of the Massachusetts Trade Secrets Act, Mass. Gen. Law c. 93 §§ 42 and 42A and Common Law Misappropriation - Against Back</u>**

125.     Plaintiff repeats and realleges Paragraphs 1 – 124 above, and incorporates them as if fully set forth herein.

126.     During the course of his employment with HMH, Back was provided access to substantial amounts of HMH confidential information.

127.     HMH's confidential information is not available to the general public and is closely guarded by HMH.   HMH keeps such information strictly confidential in order to maintain a competitive advantage over its competitors.

128.     HMH's confidential information, including the information identified herein, is considered a "trade secret" under the Massachusetts Trade Secrets Act, because the information provides HMH economic advantage from not being generally known outside of HMH's business, is not readily available by proper means, and because HMH has taken reasonable measures to guarded the secrecy of the information.

129.     Back misappropriated, exploited, and misused HMH's trade secrets and/or confidential and proprietary information to benefit himself and IXL, in their own self-interest and to compete unfairly against HMH.

130.     The disclosure and use of such information constitutes a misappropriation of trade secrets and/or confidential information in violation of M.G.L. c. 93, §§ 42 and 42A.

131.     As a result of Back's wrongdoing, HMH has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable injury due to the loss and use by the Defendants of its trade secrets and/or confidential information, for which there is no adequate remedy at law to compensate.

132.     By reason of the foregoing, HMH requires injunctive relief.  Unless injunctive relief is granted, HMH will be irreparably harmed in a manner not fully compensable by money damages.  In addition, HMH has been damaged in an amount to be determined at trial.

<u>COUNT III</u>
**Breach of Contract Against Back**

133.     Plaintiff repeats and realleges Paragraphs 1 – 132 above, and incorporates them as if fully set forth herein.

134.     HMH and Back entered into the Agreement during Back's employment with HMH.

135.     The covenants contained in the Agreement remain in full force and effect through Back's departure from HMH, and Back, for good consideration, remains obligated to comply with those covenants.

136.     HMH satisfied all of its obligations under the terms and conditions of the Agreement.

137.     By the acts described above, Back breached the Agreement by directly or indirectly soliciting the Regional Sales Managers to resign from HMH and to join IXL.

138.     As the director of sales at IXL, Back also breached the Agreement by directly or indirectly hiring the Regional Sales Managers at IXL.

139.     Back also breached the Agreement by sending confidential HMH information to his personal email account and retaining the information after his resignation from HMH.

140.     As a result of Back's breaches of contract, HMH has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable injury due to the loss of its key personnel, trade secrets and/or confidential information, and customer goodwill, for which there is no adequate remedy at law to compensate.

141.     By reason of the foregoing, HMH requires injunctive relief.  Unless injunctive relief is granted, HMH will be irreparably harmed in a manner not fully compensable by money damages.  In addition, HMH has been damaged in an amount to be determined at trial.

### COUNT IV
**Breach of Fiduciary Duty - Against Back**

142.     Plaintiff repeats and realleges Paragraphs 1 – 141 above, and incorporates them as if fully set forth herein.

143.     As a Senior Vice President of HMH, Back owed HMH a fiduciary duty and duty of loyalty.

144.     By the acts described above, Back breached his fiduciary duty to HMH when, while still employed by HMH, he solicited HMH employees to resign and seek employment from IXL.

145.     Back also breached his fiduciary duties to HMH by sending HMH trade secrets to his personal email account with the intention of misappropriating the information to compete unfairly against HMH.

146.     As a direct and proximate result of Back's breach of fiduciary duty, HMH has suffered and continues to suffer irreparable harm and monetary damages.

147.    By reason of the foregoing, HMH requires injunctive relief.  Unless injunctive relief is granted, HMH will be irreparably harmed in a manner not fully compensable by money damages.  In addition, HMH has been damaged in an amount to be determined at trial.

<u>**COUNT V**</u>
**Intentional Interference With Contractual Relations - Against IXL**

148.    Plaintiff repeats and realleges Paragraphs 1 – 147 above, and incorporates them as if fully set forth herein

149.    By the acts described above, IXL has interfered with HMH's contractual relationship with Back.

150.     IXL knew or should have known that Back's solicitation and hiring of Perryman, Siegert, and Miller, would constitute violations of Back's Agreement with HMH, but upon information and belief, IXL encouraged Back to solicit them anyway.

151.    By the acts described above, IXL had an improper motive and used improper means in interfering with HMH's contractual and/or advantageous business relations without lawful justification or legitimate reason for this interference with these contractual and/or advantageous business relationships.

152.    As a direct and proximate result of IXL's actions described above, Back was induced to breach the Agreement.

153.    As a direct and proximate result of IXL's actions described above, HMH has suffered and continues to suffer irreparable harm and monetary damages.

154.    By reason of the foregoing, HMH requires injunctive relief.  Unless injunctive relief is granted, HMH will be irreparably harmed in a manner not fully compensable by money damages.  In addition, HMH has been damaged in an amount to be determined at trial.

## REQUESTED RELIEF

**WHEREFORE,** HMH prays that this Court:

A.      Enter an order granting the relief set forth in HMH's proposed Order attached to its Motion for Temporary Restraining Order and Preliminary Injunction;

B.      Enter an Order granting a permanent injunction to the same effect as the proposed preliminary injunction;

C.      Enter judgment in HMH's favor and against Back and IXL, where applicable, for all damages that may be calculated that HMH may recover as a result of their misconduct, plus interest;

D.      Award attorneys' fees and costs;  and

E.      Grant such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

**PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES AND COUNTS SO TRIABLE.**

Respectfully submitted,

HOUGHTON MIFFLIN HARCOURT
PUBLISHING COMPANY,

By its attorneys,


 /s/ *Katherine E. Perrelli*
Katherine E. Perrelli (BBO #549820)
kperrelli@seyfarth.com
Dallin R. Wilson (BBO #676662)
drwilson@seyfarth.com
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, Massachusetts  02210
Dated:  June 9, 2020                          (617) 946-4800

## VERIFICATION

I, Mike Evans, hereby make oath and affirm that I have personal knowledge of allegations of the within Verified Complaint, and affirm that said allegations are true to the best of my knowledge and belief, except as to those allegations made upon information and belief, and as to said allegations, I believe them to be true.

Signed under the pains and penalties of perjury this 9th day of June, 2020.

_____
Mike Evans

64224979v.4

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, as identified on the Notice of Electronic File ("NEF"), and paper copies will be sent to those indicated as non-registered participants on June 9, 2020, by first class mail.

/s/ *Dallin R. Wilson*
Dallin R. Wilson