UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ————————————————— ) | |
| HOUGHTON MIFFLIN HARCOURT ) PUBLISHING COMPANY, ) ) | |
| Plaintiff, ) ) ) | C.A. No. 20-11100 |
| v. ) ) | |
| DONALD BACK and IXL LEARNING, INC., ) ) | |
| Defendants. ) ————————————————— ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Donald Back was a senior sales executive at Houghton Mifflin Harcourt Publishing Company ("HMH") and as part of his generous compensation package, he regularly received equity grants in HMH. One condition for receiving those equity grants was that Back agree to very limited restrictive covenants that merely required him to (1) refrain from utilizing HMH's confidential information for his own benefit or disclosing it to unauthorized third parties; (2) return all HMH property in his possession upon the termination of his employment; and (3) during his employment and for one year after, not directly or indirectly employ or solicit for employment any HMH employees. Yet those simple restrictions proved to be too much for Back who, after announcing his resignation from HMH, secretly emailed highly confidential HMH information and trade secrets to his personal email account before departing to become the head of sales at IXL Learning, Inc. ("IXL"), a competitor of HMH. There was no legitimate reason for Back to email himself HMH's confidential information after his resignation, other than to retain it and use it to compete unfairly against HMH on behalf of IXL. To date, Back has not returned this highly confidential information.

To make matters worse, before his departure, and notwithstanding his covenant not to solicit HMH employees, Back began encouraging several other HMH sales staff to join him at IXL.  Once he arrived at IXL, Back, with IXL's encouragement and approval, continued soliciting HMH employees that he previously managed within HMH's sales organization.  Then, in late-May 2020, Back's and IXL's plan came to fruition, when three HMH regional sales managers — collectively responsible for approximately 30% of HMH's United States territory and $130,000,000 in annual sales — simultaneously and unexpectedly resigned from HMH to follow Back to IXL, where they will work in the same territories they covered for HMH.

Back, IXL, and the departing regional managers claim that Back had no involvement in their decision to resign from HMH — as if it were some strange coincidence that they all resigned in rapid succession.  Back and IXL clearly do not take his restrictive covenants seriously and without an injunction compelling their compliance, Back and IXL will continue to retain HMH's confidential information and raid HMH's senior sales staff, causing irreparable harm to HMH. HMH therefore seeks a preliminary injunction: (1) enjoining Back and IXL, for a period of one year, from directly or indirectly employing, soliciting for employment, or otherwise contracting for the service of any HMH sales employee as of April 4, 2020, including but not limited to Ryan Perryman, Wayne Siegert, and Darrell Miller;[1] (2) enjoining Back and IXL from utilizing or disclosing HMH confidential information; (3) ordering Back and IXL to return all HMH information in their possession and to give an accounting of what they have done with the information; (4) ordering Back and IXL to certify that they have not used or transferred the confidential information Back retained; and (5) enjoining Back, and anyone acting in concert with

---

[1] Alternatively, if Perryman, Siegert, and Miller are permitted to be employed by IXL, HMH requests that they be enjoined from soliciting (a) any customers on behalf of IXL within the territories they collectively covered while employed by HMH; and (b) any customers whose names appear on the documents misappropriated by Back.

him, from directly or indirectly soliciting (a) any customers on behalf of IXL that he had material contact with or solicited while employed by HMH; and (b) any HMH customers identified in any of the documents Back misappropriated and retained after the termination of his employment with HMH.

## I.      STATEMENT OF FACTS

HMH refers the Court to, and incorporates by reference, the allegations set forth in its Verified Complaint, which is being filed contemporaneously herewith.

## II.     ARGUMENT

This Court may issue an injunction upon considering "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions…; and (4) the effect (if any) of the court's ruling on the public interest." *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 581 (1st Cir. 2001).[2] HMH has met these requirements.

### A.      HMH Has a Strong Likelihood of Succeeding on the Merits.

While likelihood of success is the touchstone of the preliminary injunction inquiry, *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998), the Court "need not predict the eventual outcome on the merits with absolute assurance." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (affirming grant of preliminary injunction). In order to demonstrate a likelihood of success on the merits, HMH must establish that it  is likely to prevail on one or more of its claims. *McKenzie*, 321 F. Supp. 3d at 188. As explained in detail below, HMH has a strong likelihood of success on the merits of its claims against the Defendants.

---

[2] "In evaluating a motion for a TRO, the Court considers the same four factors that apply to a motion for preliminary injunction." *McKenzie v. Option One Mortgage*, 321 F. Supp. 3d 186, 188 (D. Mass. 2018) (citing *Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)).

###   i.      HMH is Likely to Succeed on Its DTSA and MTSA Claims Against Back

Back's theft and threatened use of HMH's trade secrets provides an independent basis for injunctive relief under the federal Defend Trade Secrets Act of 2016 ("DTSA") and the Massachusetts Trade Secrets Act ("MTSA"). "The DTSA confers a federal cause of action on an owner of a trade secret that has been misappropriated, so long as the trade secret owner has 1) taken reasonable measures to keep such information secret and 2) the information derives independent economic value." *Allscripts Healthcare, LLC v. DR/Decision Res., LLC,* 386 F. Supp. 3d 89, 94 (D. Mass. 2019).[3]  Similarly, under applicable Massachusetts law, trade secrets include any compilation of information which is used in one's business and which gives it an opportunity to obtain an advantage over competitors who did not know or use it. *Bechtel Infrastructure Corp. v. Massachusetts Turnpike Authority*, 2003 WL 21108412 at *4 (Mass. Super. Ct. April 10, 2003).

The DTSA, like the MTSA, forbids misappropriation of trade secrets, and defines misappropriation as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or disclosure or use of a

---

[3] The DTSA defines a "trade secret" as:

> All forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if --
>
> > (A)  the owner thereof has taken reasonable measures to keep such information secret; and
> >
> > (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information

18 U.S.C.A. § 1836(3).

trade secret of another without express or implied consent." 18 U.S.C. § 1839(5).[4] Both the DTSA

and the MTSA provide for the issuance of injunctions to maintain the sanctity of trade secrets. 18

U.S.C. § 1836(3); M.G.L. c. 93 § 42A.

> 1.    *The Information Taken by Back Constitutes Trade Secrets*

The information that Back emailed to his private email account are trade secrets. The

*Amira* and *Writable* "pipeline" reports that Back sent to himself on April 1, 2020 unquestionably

contain HMH trade secrets. (Verified Complaint ("Comp."), ¶¶ 79-84.) The reports, consist of

spreadsheets that detail sales opportunities being pursued by the sales team (i.e. prospective or

potential sales) for each product and, importantly, show the status of the opportunity, the value of

the opportunity and the probability HMH has determined that the customer will ultimately

purchase the product. (*Id.*, ¶ 81.) The reports contain the names of hundreds of customers and

account details that would be highly valuable to an HMH competitor, who could use the reports to

identify customers interested in supplemental products and the probability that those customers

might buy *Amira* or *Writable* from HMH. (*Id.*, ¶ 84.)

Back also sent himself other HMH trade secrets. On March 23, 2020, the day he announced

his resignation from HMH, Back emailed himself meeting minutes from a "Core Solutions Weekly

Sales GM Call." (*Id.*, ¶¶ 74-77.) The meeting minutes contained updates from five HMH regional

sales managers — including Ryan Perryman, one of those he convinced to join IXL — identifying

major accomplishments from "last week," "focus areas for your team next week," and "any

impediments in your way." (*Id.*, ¶ 75.) Each sales manager identified recent sales to HMH

customers, including pricing; strategies for marketing and selling HMH products, particularly

---

[4] M.G.L. c. 93 § 42 similarly defines misappropriation as "embezzle[ing], steal[ing] or unlawfully tak[ing], carr[ying] away, conceal[ing], or cop[ying], or by fraud or by deception obtain[ing], from any person or corporation, with intent to convert to his own use, any trade secret, regardless of value."

when many schools are closed during the current COVID-19 pandemic; and challenges faced by HMH, including customers that had cancelled orders due to COVID-19. (*Id.*, ¶¶ 76-77.) Information concerning customers, marketing, and sales strategies clearly qualifies as a trade secret. *See Repat, Inc. v. IndieWhip, LLC*, 281 F. Supp. 3d 221, 228 (D. Mass. 2017) ("There is no doubt that marketing strategies can attain trade secret status"); *Convergent Nonprofit Sols., LLC v. Wick*, 2019 WL 7423549, at *5 (M.D. Fla. Sept. 5, 2019) ("documents pertaining to . . . administration and corporate initiatives, and sales/clients/active projects" that defendant downloaded in the days preceding her separation "clearly constitutes trade secrets under the DTSA").

The HMH *Amira* Pilot dashboard that Back emailed to himself on March 27, 2020, four days after announcing his resignation, is also a trade secret. (Comp., ¶ 85.) The dashboard contains confidential information about pilot programs concerning HMH's *Amira* supplemental offering, which competes directly with IXL products. (*Id.*) The dashboard contains information such as the number of pilot programs by region, the status of each pilot program, the number of participating students by region and status, and forecasts of sales by category and status. (*Id.*) The information contained in the *Amira* Pilot dashboard is not shared publicly and it would give IXL a competitive advantage to know the status of HMH's product development and sales forecasts.

The PowerPoint slide deck that Back emailed to himself on March 30, 2020, four days before he left HMH, is also a trade secret. (*Id.*, ¶¶ 86-87.) The slide deck contains information about HMH's strategy for competing for an upcoming Florida reading "adoption." (*Id.*)[5] The slide deck that Back took identifies HMH's strategies, timelines, and pricing, for competing for the upcoming Florida reading adoption. (*Id.*)

---

[5] An adoption is where a state requests bids for school curriculum products throughout the entire state. Adoptions from large states, such as Florida, therefore provide a significant opportunity for sales to HMH (and IXL).

In addition to sending HMH confidential information to his personal email account, Back began downloading highly confidential information from HMH's cloud-based file sharing platform, Box.  (*Id.*, ¶¶ 89-90.)  Two such documents are particularly concerning.  First, Back downloaded a document titled HMH Renaissance Overview, a 99-page PowerPoint deck that relates to HMH's partnership with Renaissance, a provider of pre-K-12 analytics programs.[6]  (*Id.*, ¶ 91.)  This slide deck included information regarding HMH's capabilities in personalized assessment and growth measures.  (*Id.*)  Information about how Renaissance and HMH products work together is highly confidential.  Second, Back downloaded a document called Pipeline Review Master, a 232-page slide deck from March, 2020.  (*Id.*)  The document contains highly detailed information regarding the strengths and strategies for each of HMH's sales regions.  The information in the document details HMH's current status and its plans for the future.  (*Id.*)  Such information indisputably would be valuable to other companies competing with HMH.  *See Earthbound Corp. v. MiTek USA, Inc.*, 2016 WL 4418013, at *10 (W.D. Wash. Aug. 19, 2016) ("detailed information about [plaintiff's] current and prospective customers, pending projects, bid, pricing, product design, and other elements of its business constitute trade secrets" under DTSA).

In the six months preceding Back's departure, he sent over 240 documents to his personal Gmail account.  He sent the vast majority of these *after* announcing his resignation, which contained confidential sales strategy and customer information.  And after Back departed from HMH, and while working for IXL, he attempted to access HMH sales documents, without authorization or a legitimate purpose whatsoever.  (Comp., ¶¶ 97-99.)

The information Back succeeded in appropriating is not generally known to the public and would give a competitor who acquired it (such as IXL) an unfair competitive advantage by, among

---

[6] HMH partnered with Renaissance in 2018 to integrate Renaissance's analytics tools with HMH's core curriculum programs.

things: (a) knowing what products and customers HMH is currently targeting, including marketing strategies, size of opportunities, and challenges that HMH foresees; (b) allowing the competitor to unfairly compete against HMH using such information to poach HMH customers; and (c) allowing a competitor to submit competing bids for state adoptions and other opportunities that HMH is also pursuing.  (*Id.*, ¶ 33.)  Additionally, HMH takes great measures to protect this information. (*Id.*, ¶¶ 21-29.)  Indeed, each of the emails that Back forwarded to his personal email account were not widely circulated among other HMH employees, but were instead limited to a select group of employees that were on a "need to know" basis.

This information is precisely the kind of carefully curated and protected information that is considered a trade secret under the DTSA.  *See Henry Schein, Inc. v. Cook*, 2016 WL 3212457, at *3 (N.D. Cal. June 30, 2016) (analyzing application for injunction under DTSA and other claims and holding that "[c]ustomer information such as sales history and customer needs and preferences constitute trade secrets").[7]

### 2. *Defendants Misappropriated HMH's Trade Secrets*

Back has misappropriated HMH's trade secrets.  A person misappropriates trade secrets when he or she acquires the trade secrets with knowledge that they were acquired by improper means.  18 U.S.C. § 1839(5).  The DTSA specifically provides that a breach of a contractual duty to maintain secrecy of such information is one of the "improper means" contemplated by the statute.  *See* 18 U.S.C. § 1839(6); *see also Allstate Insurance Company v. Fougere*, 2019 WL 4776986, at *24 (D. Mass. Sep. 30, 2019) ("As a matter of law, an individual who breaches

---

[7] *See also Allstate Ins. Co. v. Rote*, 2016 WL 4191015, at *3 (D. Or. Aug. 7, 2016) ("[c]ustomer information such as sales history and customer needs and preferences constitute trade secrets"); *Mintel Int'l Grp., Ltd. v. Neergheen*, 2010 WL 145786, at *11 (N.D. Ill. Jan. 12, 2010) ("The documents that Neergheen e-mailed to himself are trade secrets. Those files dealt with Mintel's marketing activities, projects, and initiatives, and included information regarding specific vendors, [and] prospective clients").

contractual duties to obtain trade secrets has used improper means."). Under Massachusetts law, acquiring a trade secret through a "breach of a confidential relationship" is also recognized as an improper means of acquiring a trade secret. *Blake v. Prof'l Coin Grading Serv.*, 898 F. Supp. 2d 365, 393 (D. Mass. 2012). Courts have also found that employees who email confidential information to their private email addresses have used "improper means" and have engaged in misappropriation. *See Complete Fire Prot., Inc. v. Kolman*, 2019 WL 1755280, at *2 (D. Colo. Apr. 19, 2019) ("the facts suggest that Kolman acquired the trade secrets by improper means, *i.e.*, e-mailing to his personal (rather than work) e-mail address screenshots of secured company data shortly before his departure from the company and commencing employment at one of CFP's competitors.").

Even if Back and IXL claim that they have not used HMH's trade secrets, injunctive relief is still warranted. Under the DTSA and the MTSA, a court may grant an injunction "to prevent any actual *or threatened* misappropriation." 18 U.S.C. § 1836(b) (emphasis added); M.G.L. c. 93, § 42A(a) ("Actual or threatened misappropriation may be enjoined upon principles in equity"). In the absence of direct evidence, courts will still grant injunctive relief when circumstantial evidence supports an intent to use misappropriated trade secrets. *Advanced Micro Devices, Inc. v. Feldstein*, 2013 WL 10944934, at *9 (D. Mass. May 15, 2013) (finding "circumstantial evidence" of misappropriation "compelling" where former employees downloaded substantial amounts of the plaintiff's trade secrets to thumb drives before their resignations). "Direct evidence of intent or proof of deliberate scheming is rarely available in instances of inequitable conduct, but intent may be inferred from the surrounding circumstances." *Id.* The fact that Back emailed the HMH trade secrets to himself *after* he tendered his resignation, and for no apparent legitimate business purpose, further evidences his intention to use the information on behalf of IXL. *See id.* (finding

plaintiff had a reasonable likelihood of success on misappropriation claim where defendants'

denials that they did not intend to misappropriate trade secrets were "not credible").[8]

### 3.    Injunctive Relief is Expressly Authorized by the DTSA and MTSA

An injunction is appropriate and, indeed, necessary to protect HMH's interests, because

Defendants' possession and use of trade secret information, which they obtained through improper

means, provides them with an unfair competitive advantage and the opportunity to cause

substantial harm to HMH.  18 U.S.C. § 1836(b)(3)(A)(i)(I).  The DTSA provides for the issuance

of an injunction to maintain the sanctity of trade secrets.  In fact, the DTSA *expressly* allows for

injunctive relief *including* "conditions placed on . . . employment . . . based on evidence of

threatened misappropriation.," such as, for example, restrictions on customer and employee

solicitation — even in the absence of a contractual provision for the same. 18 U.S.C. §

1836(b)(3)(A)(i)(I).  *See, e.g., Waymo LLC v. Uber Techs., Inc.,* 2017 WL 2123560 (N.D. Cal.

May 15, 2017) (enjoining defendant who downloaded 14,000 confidential files from former

employer from working on self-driving automobile technology).[9]  And the MTSA permits the

Court to enjoin actual or threatened misappropriation "upon principles of equity, including but not

limited to consideration of prior party conduct and circumstances of potential use."  M.G.L. c. 93,

§ 42A(a).

---

[8] *Radiant Global Logistics, Inc. v. Furstenau*, 368 F. Supp. 3d 1112, 1130-31 (E.D. Mich. Feb. 20, 2019) (finding that former employee threatened to misappropriate employer's trade secrets where court found employee's testimony to "be inherently incredible" with respect to his "accumulation of 300 Radiant emails in his personal account"); *Executive Consulting Group, LLC v. Baggot*, 2018 WL 1942762, at *8 (D. Col. Apr. 25, 2018) ("there is a high likelihood that ECG will establish both actual and threatened misappropriation of its trade secrets by Defendant; as set forth above, Defendant emailed the trade secrets to her personal email account, in violation of duties she owed to ECG under her Employment Agreement and otherwise.").

[9] *See also Engility Corporation v. Daniel*s, 2016 WL 7034976, at *1 (D. Colo. Dec. 2, 2016) (enjoining defendant from competing for certain business where evidence was presented that he transferred proprietary information onto flash drives); *W.W. Williams Co., LLC v. Reza*, 2017 WL 5068522 (D. Nev. Sept. 20, 2017) (enjoining defendants from soliciting plaintiff's customers and employees under DTSA).

### ii.       HMH is Likely to Succeed on Its Breach of Contract Claim

To succeed on its claim for breach of contract, HMH must establish: (1) the existence of an enforceable contract; (2) for valid consideration;  (3) performance by HMH and a breach by Back; and (4) damage to HMH.  *See Singarella v. Boston*, 342 Mass. 385, 387 (1961).

### 1.       The Agreement is Enforceable

An employer can enforce a restrictive covenant if it is "1) necessary to protect a legitimate business interest, 2) reasonably limited in time and space and 3) consistent with the public interest." *178 Lowell St. Operating Co., LLC v. Nichols*, 152 F. Supp. 3d 47, 54 (D. Mass. 2016). Here, Back's confidentiality and non-solicitation/no-hire obligation in the Agreement easily satisfies this standard.

First, the protection of confidential information and trade secrets are widely accepted as legitimate business interests served by restrictive covenants.  *See New England Canteen Service, Inc. v. Ashley*, 372 Mass. 671, 674 (1977) ("If any or all of these interests [trade secrets, confidential information, and/or goodwill] are present in a given case in which a noncompetitive covenant is part of a contractual agreement, . . .  a court of equity will not deny enforcement of a reasonable covenant"); *Glebus*, 2003 WL 914994 at *4 (D. Mass. Dec. 30, 2003) ("Along with goodwill, courts have also recognized a legitimate business interest in confidential and proprietary information").  Furthermore, Massachusetts courts have held that employers have a legitimate business interest in preventing high ranking employees from using inside knowledge to target and hire key employees.  *See Automile Holdings, LLC v. McGovern*, 483 Mass. 797, 813 (2020) (enforcing no hire provision in separation agreement between car dealership and former executive and minority owner who later hired three of plaintiff's employees at his new company); *see also Modis, Inc. v. Revolution Grp., Ltd.*, 1999 WL 1441918, at *7 (Mass. Super. Dec. 29, 1999) ("The restrictive covenants here, particularly the non-solicitation and non-raiding provisions, are

necessary to protect Modis' legitimate business interests").  Likewise, courts have found one-year employee non-solicitation restrictions to be reasonable and supported by a legitimate business interest in retaining high-ranking employees and consistent with the public interest.  *See Nichols*, 152 F. Supp. 3d at 54; *Feldstein*, 2013 WL 10944934, at *11 ("Employers clearly have a legitimate business interest in preserving the talent and goodwill of their employees.").  The Agreement is therefore enforceable.

### 2.       *Back Breached the Agreement*

There can be no serious dispute that Back breached the Agreement by the role he played in IXL's hiring of 30% of HMH's sales leadership, and by covertly sending HMH confidential information to his personal email account and then retaining it after the termination of his employment with HMH.  Section 1 of the Agreement prohibits Back from utilizing HMH confidential information for his own benefit or from directly or indirectly disclosing any confidential information to any third party.  (Comp., ¶ 68.)  Section 2 requires Back, upon HMH's demand or at the termination of his employment, to "immediately return to [HMH] all Company Property in [his] possession, custody or control."  (*Id.*, ¶ 69.)  Company Property means "all property and resources of the Company, including without limitation, Confidential Information, memoranda, notes, lists, records and other documents or papers . . . ."  (*Id.*)  Back breached the Agreement by emailing himself confidential HMH information and then retaining it after the termination of his employment.[10]

---

[10] On June 5, 2020, HMH sent cease and desist letters to Back and IXL, notifying them of Back's breaches of the Agreement, including that Back had retained, used, and/or shared HMH confidential information.  In response, Back's and IXL's counsel claimed that "neither IXL nor Mr. Back have utilized or disclosed . . . any HMH confidential information or trade secrets[.]"  Notably, counsel did not deny that Back retained HMH confidential information after the termination of his employment.

Back also breached Section 4 of the Agreement, which prohibits Back, during his employment and for a one year period thereafter, from "directly, or indirectly, employ[ing], solicit[ing] for employment or otherwise contract[ing] for the services of any employee of the Company or any of its affiliates at the time of this Agreement or who shall subsequently become an employee of the Company or any such affiliate." (*Id.*, ¶ 70.) Setting aside whether Back directly or indirectly solicited HMH's employees, he breached the Agreement when IXL hired Perryman, Siegert, and Miller.  Section 4 prohibits Back from "directly or indirectly employ[ing]" HMH employees.  (*Id.*)  As the head of sales at IXL, Back is IXL's agent and, for all intents and purposes, when IXL hires regional sales managers, Back is the one employing them.  At a minimum, any senior sales member at IXL is indirectly employed by Back.  *See Hilb Rogal & Hobbs of Massachusetts, LLC v. Sheppard*, 2007 WL 5390399, at *6 (Mass. Super. Dec. 31, 2007) (enjoining new employer from soliciting plaintiff's employees where new employer "knew of the [non-solicitation] agreements, and actively encouraged the employees to break them, offering defense and indemnification for anticipated litigation arising from such breach."). Therefore, by employing Perryman, Siegert, and Miller, Back has breached the Agreement..

One court in this District noted the difficultly in defining what conduct amounts to employee solicitation.  *See Feldstein*, 2013 WL 10944934, at *11.  The court defined "direct solicitation" as "encompassing any active verbal or written encouragement to leave [their employer], even if not intended to harm [their employer]."  *Id.*  "[L]iability for indirect solicitation requires a more context-sensitive inquiry . . . [and] such solicitation should only be found where the finder-of-fact is satisfied that the solicitor actually *intended* to induce the solicitee to leave [their] employer."  *Id.* In *Feldstein*, the court held that a lunch meeting between colleagues of almost ten years where the defendant made positive comments about his experience at his new

employer, without more evidence, did not amount to solicitation.  *Id.*  But the court considered statements that the defendant "wanted [her former colleague] to join her" and "asked how quickly [her former colleague] could give notice" constituted direct solicitation and were "precisely the sort of active encouragement that [the plaintiff] sought to forestall through its [non-solicitation agreements]." *Id.* at *11-12.

Back's and IXL's claim that he was not involved with IXL's solicitation and hiring of Perryman, Siegert, and Miller is not credible.  (Comp., ¶ 111.)  It cannot be a coincidence that three HMH regional sales managers, with close and lengthy relationships with Back, each decided to follow Back to IXL and to resign from HMH simultaneously.  And the emails Back forwarded, while still employed by HMH, to  multiple HMH  employees, attaching resumes and biographical summaries and soliciting personal email addresses (expressly designed to continue the conversation outside of HMH's email platform), at a minimum, evidence an intent to indirectly encourage these employees to join him at IXL.  (*Id.*, ¶¶ 92-96.)  Several of them did. (*Id.*, ¶ 100.)

### 3.    *HMH Has and Will be Damaged by Back's Breach*

Back's actions have damaged HMH's legitimate business interests and have denied HMH the benefit of its bargain with respect to the restrictive covenants.  As explained below, where a party's trade secrets have been misappropriated, there is a presumption of irreparable harm. Moreover, HMH has been harmed by losing a substantial portion of their senior sales staff overnight.  The three departing employees oversaw approximately $130,000,000 in annual sales in their combined territories and HMH will be forced to spend significant time and money hiring and training their replacements.  (*Id.*, ¶ 105.)  The harm is magnified by the current COVID-19 pandemic, which will make onboarding and training new employees even more difficult.  HMH's goodwill with its customers serviced by the Regional Sales Managers will also suffer, particularly

if, as is expected, the Regional Sales Managers solicit those same customers when they commence employment with IXL.

### iii.    HMH is Likely to Succeed on its Breach of Fiduciary Duty Claim

To prevail on its claim for breach of fiduciary duty, HMH must establish (1) the existence of a fiduciary duty; (2) breach of that duty; (3) damages; and (4) a causal connection between the breach of the duty and the damages.  *Baker v. Wilmer Cutler Pickering Hale & Dorr LLP*, 91 Mass. App. Ct. 835, 842 (2017).  "Under Massachusetts law, officers and directors owe a fiduciary duty to protect the interests of the corporation they serve." *Geller v. Allied–Lyons PLC*, 42 Mass. App. Ct. 120, 122 (1997).  Senior executives are considered to be corporate fiduciaries and to owe their company a duty of loyalty. *Id*. (assuming that senior vice president owed fiduciary duty) (citing *Chelsea Indus. v. Gaffney*, 389 Mass. 1, 11–12 (1983)).  Massachusetts courts have construed an employees' misappropriation of their employers' trade secrets as a breach of fiduciary duty.  *See Intertek Testing Servs. NA, Inc. v. Curtis–Strauss LLC*, 2000 WL 1473126, at *9 (Mass. Super. Aug. 8, 2000) (quoting *Augat, Inc. v. Aegis, Inc*., 409 Mass. 165, 172–73 (1991)).  Likewise, a top managerial employee that solicits the departure of fellow employees while still employed breaches his fiduciary duty to his employer.  *Augat,* 409 Mass. at 173-74 (1991) (top managerial employee may not solicit the departure of employees to work for a competitor); *Eastern Marble Products Corp. v. Roman Marble, Inc.,* 372 Mass. 835, 838-42 (1977) (managerial employee may not solicit his employer's customers while still working for his employer); *Gaffney,* 389 Mass. at 19 (corporation was to be compensated for expenses it incurred as result of serious disruption and damage to business and operations by virtue of executives' breach of their fiduciary duties).  HMH is likely to succeed on its claim that Back breached his fiduciary duty to HMH when he misappropriated HMH trade secrets and solicited HMH employees while he was still employed by the company.

### iv.     HMH is Likely to Succeed on its Claim for Intentional Interference With Contractual Relations

"In an action for intentional interference with contractual relations, the plaintiff must prove that: (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 272 (1991).  The plaintiff may prove either improper motive or improper means and is not required to prove both. *Kurker v. Hill*, 44 Mass. App. Ct. 184, 191 (1998).   "For purposes of this cause of action, 'improper means' may consist of a violation of a statute or common-law precept."

HMH has already established that it had an enforceable contract with Back.  IXL had knowledge of the Agreement, at the latest, when HMH sent its cease and desist letter to IXL on June 1, 2020.  (Comp., ¶¶ 110-111.)  HMH is likely to prove that IXL intentionally interfered with the Agreement by inducing Back to misappropriate HMH confidential information and/or by encouraging him to solicit and/or hire HMH employees on behalf of IXL. Reasonable inferences on the record to date, even at this preliminary stage, strongly point to IXL at least participating in Backs's solicitation of three key sales employees from HMH. It defies logic that others at IXL would not have been involved in these hires, particularly in light of the company's press release which noted that Back would be in charge of "accelerating sales worldwide and expanding a strong team."   "At the preliminary injunction stage, it is, after all, the district court's duty—and its prerogative—to assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications."  *Weaver v. Henderson*, 984 F.2d 11, 13 (1st Cir. 1993) (quotations omitted). Moreover, encouraging Back to misappropriate HMH trade secrets and to breach his non-solicitation covenants constitute improper motive and means.  *See, e.g., Sentient Jet, LLC v.*

*Apollo Jets, LLC*, 2014 WL 1004112, \*10 (D. Mass. March 17, 2014); *Nichols*, 152 F. Supp. 3d at 56 (finding likelihood of success on interference claim where new employer was aware of non-solicitation covenants); *Hilb Rogal & Hobbs of Massachusetts, LLC*, 2007 WL 5390399, at \*6 (finding likelihood of success where new employer "knew of the [non-solicitation] agreements, and actively encouraged the employees to break them, offering defense and indemnification for anticipated litigation arising from such breach.").

### B.       HMH Will Suffer Irreparable Harm Without An Injunction

HMH will suffer irreparable harm if a Temporary Restraining Order and Preliminary Injunction does not issue based on Back's misappropriation of HMH's trade secrets and solicitation of HMH employees.   It is well-settled in this District that "[w]hen a plaintiff demonstrates a likelihood of success on a misappropriation of trade secrets claim, it need not prove irreparable injury because such harm is presumed." *EchoMail, Inc. v. Am. Express Co.*, 378 F. Supp. 2d 1, 4 (D. Mass. 2005); *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F.Supp.2d 217, 241 (D. Mass. 2011).   Courts have likewise found a threat of irreparable harm where former employees have breached restrictive covenants to not solicit their former employer's employees. *See Nichols*, 152 F. Supp. 3d at 58-59 (D. Mass. 2016) (finding a threat of irreparable harm due to "likely threat of future solicitation by defendants"); *Feldstein*, 2013 WL 10944934, at \*12 ("Courts have routinely accepted the threat of future solicitation as an irreparable harm").   Moreover, even assuming that the Defendants are willing to return and not use or disclose HMH's confidential information, the harm to HMH cannot be avoided simply by Defendants' "intention not to disclose confidential information, or even by [their] scrupulous efforts to avoid disclosure." *Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297 (D. Mass. 1995).   The doctrine of inevitable disclosure "allows the court to enjoin a former employee from working at a competitor of the employer . . . if the court finds that such employment would inevitably lead to disclosure" of confidential business

information or trade secrets. *Architext, Inc. v. Kikuchi*, 2005 WL 28464244, *3 (Mass. Super. Ct. May 19, 2005).[11]

Moreover, time is of the essence. The Regional Sales Managers are scheduled to commence their employment on June 15, 2020. (Comp., ¶¶ 103-104.) Moreover, each day that passes with Back in possession of HMH's trade secrets causes further irreparable harm.

### C.     HMH's Irreparable Harm Outweighs Any Harm That Injunctive Relief Would Inflict on Defendants

The balance of the hardships tips strongly in HMH's favor. As discussed above, HMH will be irreparably harmed in various ways if the Court does not grant the requested injunctive relief. The harm, if any, to Defendants if the Court prohibits them from using, disclosing, or retaining confidential HMH information pales in comparison to the irreparable harm HMH will incur from the exploitation of its confidential information and trade secrets. Likewise, enjoining Defendants from soliciting and hiring HMH employees will cause Defendants minimal harm. They are only prohibited from hiring employees from one company and that prohibition only exists for one year. *See Modis, Inc.*, 1999 WL 1441918, at *8 (defendant "could hire any other person to work for his new company as long as they were not employed by Modis within the last year."). Indeed, HMH is only seeking to enjoin IXL from hiring HMH's sales team members; IXL is free to hire HMH employees from other departments. On the other hand, allowing Defendants to continue to raid HMH's senior sales staff not only deprives HMH the benefit of its bargain with Back, but also exposes it to substantial losses in sales and customer goodwill. *See Feldstein*, at *13 ("The equitable relief sought by AMD does little more than enjoin Defendants from engaging in activities from which they are already contractually barred.")

---

[11] *Marcam,* 885 F. Supp. at 297 (even where employee intends to keep former employer's secrets, "he will . . . inevitably, even if inadvertently, be influenced by the knowledge he possesses of all aspects of [the former employer's] development efforts . . .").

**D.      The Granting of Injunctive Relief Will Not Adversely Affect the Public Interest**

Injunctive relief will serve the public interest by upholding valid contracts and prohibiting the Defendants from unfairly competing with HMH.  Fair competition is in the public interest. Unfair competition is not.   Public policy supports enforcement of the Agreement, as an employer has a right to protect its trade secrets, confidential business information, and goodwill.  *New England Circuit Sales, Inc. v. Randall*, 1996 WL 1171929, *3 (D. Mass. June 4, 1996) ("It is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted. Allowing an individual to disregard such a promise would result in behavior which should not be condoned or encouraged."); *Lombard*, 2010 WL 2682449 at* 4.

Nothing in the requested injunctive relief will have any adverse effect on the public interest. Although the injunction would prohibit members of HMH's sales team from moving to IXL for one year, nothing prevents them from accepting employment with other companies, even competitors.  "The restrictive covenant at issue here does not . . . preclude anyone from earning a living.  [Back] was allowed to freely compete so long as he did not raid his former employer's employees.   The provision also [does] not prohibit [HMH] employees from competing with [HMH] generally, but just prevent[s] them from working for [Back]."  *Automile Holdings, LLC*, 483 Mass. at 817; *Feldstein*, at *13 ("Certainly, AMD and other businesses have a legitimate interest in holding onto their talented employees").

## III.      THE INJUNCTION SOUGHT BY HMH IS REASONABLE

The injunctive relief HMH seeks is reasonable and the Court has the authority to award it. As set forth above, the DTSA allows for injunctive relief *including* "conditions placed on . . . employment . . . based on evidence of threatened misappropriation.," such as, for example, restrictions on customer and employee solicitation — even in the absence of a contractual

provision for the same. 18 U.S.C. § 1836(b)(3)(A)(i)(I).  And the MTSA permits the Court to enjoin actual or threatened misappropriation "upon principles of equity, including but not limited to consideration of prior party conduct and circumstances of potential use."  M.G.L. c. 93, § 42A(a).

HMH is mindful that the Agreement does not contain non-competition or a customer non-solicitation covenants. Yet, considering Back's conduct in misappropriating HMH's trade secrets, while at the same time soliciting and/or hiring HMH employees that will be selling IXL's products to the same customers that they sold to while at HMH, the Court should issue an injunction that at least restricts Back's and the Regional Sales Managers' employment with IXL.

Even before Massachusetts adopted the MTSA in 2018 — which permits courts to impose broader injunctions than at common law — Massachusetts courts granted similar injunctive relief in the absence of a non-compete or customer non-solicit covenant.  *See HX in Boston, LLC v. Berggren*, 2008 WL 516582 (Mass. Super. Feb. 11, 2008) (enjoining former employee from soliciting any customers listed on any document misappropriated by the defendant).  And federal courts have imposed restrictions on employment under the DTSA based on an employee's misappropriation.  *See, e.g., Protection Technologies, Inc. v. Ribler*, 2017 WL 923912 (D. Nev. March 8, 2017) (enjoining sales manager that downloaded trade secrets from soliciting business from his former employer's customers despite no non-compete or non-solicitation covenants).

## **CONCLUSION**

For the foregoing reasons, the Court should grant HMH's motion and issue a Temporary Restraining Order consistent with the proposed Order attached hereto as Exhibit 1 and, after a hearing, issue a Preliminary Injunction consistent with the proposed Order attached hereto as Exhibit 2.

Respectfully submitted,

HOUGHTON MIFFLIN HARCOURT
PUBLISHING COMPANY,

By its attorneys,


 _/s/ Katherine E. Perrelli_____
Katherine E. Perrelli (BBO #549820)
kperrelli@seyfarth.com
Kristin G. McGurn (BBO #559687)
kmcgurn@seyfarth.com
Dallin R. Wilson (BBO #676662)
drwilson@seyfarth.com
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, Massachusetts  02210
Dated:  June 9, 2020                               (617) 946-4800


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, as identified on the Notice of Electronic File ("NEF"), and paper copies will be sent to those indicated as non-registered participants on June 9, 2020, by first class mail.

/s/ _Dallin R. Wilson_____
Dallin R. Wilson